STATE of Missouri, Respondent,

v.

**Jeromy LAY, Appellant.**

**Jeromy LAY, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. WD 47287 (Consolidated with WD 49634).

Missouri Court of Appeals, Western District.

April 11, 1995.

---

2. Present counsel for defendant did not represent him in the trial court.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary Moulton Bryan, Asst. Atty. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Defendant–Appellant Jeromy Lay was convicted of murder in the first degree in violation of § 565.020.[1] Defendant was sentenced to life in prison without possibility of probation or parole. He filed a post-conviction motion under Rule 29.15, which was denied. His appeals of the conviction and of the denial of post-conviction relief were consolidated and both are addressed in this opinion.

Defendant appeals his first degree murder conviction on the grounds that: (1) the trial court plainly erred by admitting certain autopsy and crime scene photographs introduced by the state because any probative value of the photographs was outweighed by their prejudicial effect on the jury; (2) the trial court erred in overruling defendant's challenge for cause to venireperson Davis because failure to strike Mr. Davis denied defendant his right to a panel of qualified jurors from which to make his peremptory strikes; and (3) the trial court erred in overruling defendant's objection to the introduction of a utility knife which was obtained as a result of an unlawful search and seizure. Defendant appeals the motion court's denial of his Rule 29.15 motion claim on the basis that he received ineffective assistance of counsel in that his trial counsel failed to object and preserve for appellate review the introduction of the photographs mentioned under Point I. We find no error and affirm both the conviction and denial of post-conviction relief.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The evidence introduced at trial in support of the verdict consisted of the following: On the evening of April 6, 1991, defendant Jeromy Lay, his younger twin brothers Jason and Justin Minks, and their friend, Johnny Lingo, were at the Minks' residence.[2] The victim Howard Kirtley was an elderly gentleman who lived across the back alley from the Minks' residence.

Mr. Lingo testified about the events on the evening of the murder. Mr. Lingo said that, at some point in the evening, defendant and his brother Jason proposed stealing some money from Mr. Kirtley. Defendant and Jason were discussing robbing Mr. Kirtley when Jason suggested that they kill Mr. Kirtley. Defendant produced what the witnesses variously referred to as a "box cutter" or utility knife from his car. Jason formulated a plan by which he would cut Mr. Kirtley's throat with the box cutter/utility knife while someone distracted him.

Jason convinced his twin brother Justin to go with him to Mr. Kirtley's house. Defendant and their friend Mr. Lingo stayed in the Minks' backyard. Jason and Justin knocked on Mr. Kirtley's door and Justin asked Mr. Kirtley if he could use the phone. However, Jason did not attack Mr. Kirtley and they returned home without completing the plan.

When they returned to the Minks' residence, Jason complained that the blade on the box cutter/utility knife was too small to kill Mr. Kirtley and that Justin was not doing a good enough job as a decoy. Defendant went into the Minks' house and returned with a large kitchen knife with a serrated edge. Defendant asked "Will this do?" and Jason responded, "It should." Jason asked defendant to return to Mr. Kirtley's house with him and Justin. Defendant said he would go, but if he did go, Jason had better kill Mr. Kirtley.

The three brothers went to Mr. Kirtley's house while Mr. Lingo stayed in the Minks' back yard. Jason asked Mr. Kirtley if they could use the phone again. Justin used the phone while defendant stood by the door in order to turn off the lights and Jason moved into a position behind Mr. Kirtley. When Justin hung up the phone, Jason reached behind Mr. Kirtley and cut the right side of his throat. Defendant turned off the lights.

Justin ran out of the back door of Mr. Kirtley's house knocking defendant out the door as well. A struggle ensued at the back door as Mr. Kirtley tried to push the door

---

1. All statutory references are to the 1986 Revised Statutes of Missouri unless otherwise indicated.

2. In order to avoid confusion, the twin brothers will be referred to by their first names.

shut and Jason and defendant tried to push it open. Mr. Kirtley yelled at Jason, "You're killing me, bastard."

Justin went back to his house but continued to watch the movements in Mr. Kirtley's house from his own kitchen window. Justin saw defendant cut the phone cord. A few seconds later, Jason emerged from the northwest bedroom, took the knife from defendant, and returned to the bedroom. Justin could not see into the bedroom and could not see Mr. Kirtley. Defendant took Mr. Kirtley's wallet and a pack of cigarettes.

Defendant and Jason returned to their house. Jason had blood on his face, hands, clothes, and shoes, and a deep cut on his fingers. Defendant had blood on his shoes, hands, and a little on his clothes. They cleaned off their shoes, clothes, and the knife, and defendant divided up the money from Mr. Kirtley's wallet. Defendant told Justin and Mr. Lingo to get some gasoline and burn Mr. Kirtley's house. They refused to do so.

Mr. Kirtley's body was not found until Tuesday, April 9th, in a large pool of blood in the northwest bedroom of his house. There were at least 20 different cutting wounds including 10 cutting wounds to his neck, wounds on both sides of his face, and a stab wound to the chest. In addition, there were several cuts on Mr. Kirtley's hands which appeared to be defense wounds that would be incurred by a person trying to ward off a knife attack. There were several bloody footprints at the Kirtley home, many of which had the letters "C–O–N–S" or the word "Converse" imprinted in the blood.

Police first questioned defendant as part of their regular canvas of the neighborhood for witnesses, and noticed that defendant was wearing Converse tennis shoes. He became nervous when the police detective asked to see his shoes. Because of this, defendant was questioned again by police and highway patrol officers. Although defendant first denied any involvement in Mr. Kirtley's death, he eventually admitted that he had been in the house and saw the attack, although he denied any involvement beyond cutting the phone cord. Defendant claimed he tried to separate Jason from Mr. Kirtley. Defendant also told the police officers that the knife

used to kill Mr. Kirtley and the tennis shoes that defendant and his brothers wore the night of the murder were at the Minks' residence. Defendant agreed to go to his house with the officers to point out the items. Defendant's stepfather signed a consent to search the house. Defendant pointed out the knife Jason used to kill Mr. Kirtley and the jeans and shirts they were wearing the night of the murder.

While the police officers were searching the Minks' residence, defendant asked if they were going to search his car and the officers responded that they were. Defendant did not say anything in response. The officers found a utility knife in defendant's car and seized it as evidence. When defendant was booked, the officer taking an inventory of his personal belongings found a $20.00 bill in his wallet with a spot of dried blood on it.

Defendant presented no evidence in his defense. The jury found him guilty of first-degree murder and recommended a sentence of life imprisonment without the possibility of probation or parole. The court sentenced defendant in accordance with the jury's recommendation.

## II. ADMISSION OF CRIME SCENE AND AUTOPSY PHOTOGRAPHS WAS NOT ERROR

Under Point I defendant contends the trial court plainly erred in admitting into evidence certain crime scene and autopsy photographs because any probative value of the photographs was outweighed by their prejudicial effect on the jury. Specifically, defendant contends State's Exhibits 3, 4, 5, 36, 37, 38, 39, 41, 42, and 43 were cumulative, repetitious, gruesome, and unduly inflammatory.

### A. Standard of Review.

Because defendant did not object to the use or admission of the photographs at trial, the standard of review is plain error. Plain error is limited to a determination of whether the trial court's actions resulted in manifest injustice or a miscarriage of justice. Rule 30.20; *State v. Childers*, 801 S.W.2d 442, 444 (Mo.App.1990).

B. *Photographs Are Relevant and Admissible to Show Location and Nature of Wounds, Clarify Testimony of Witnesses, or Establish Elements of the Crime.*

 The trial court is vested with broad discretion in the admission of photographs and its decision may be overturned only upon a showing that the trial court abused its discretion. *State v. McMillin,* 783 S.W.2d 82, 101 (Mo. banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Photographs of victims' bodies should not be admitted where their sole purpose is to arouse the emotions of the jury or to prejudice the defendant. *State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc 1980), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980).

The Missouri Supreme Court stated in *State v. Feltrop,* 803 S.W.2d 1 (Mo. banc 1991), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), however, that photographs of the victim's body and wounds are admissible when they are relevant "to show the nature and condition of the body, the nature and condition of the wounds, to aid the jury in understanding the testimony of the medical examiner, to corroborate testimony of various state's witnesses, and to aid the state in establishing an element in its case." *Id.* at 10–11. The Court further held that photographs are not irrelevant as being cumulative where they depict "different wounds and views of the body." *Id. See also State v. Murray,* 744 S.W.2d 762, 772 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

 While the trial court would have been within its discretion in excluding some or all of the photographs objected to, they were sufficiently probative of the nature and condition of the body and wounds, and relevant to aiding the jury in understanding the testimony of various state's witnesses, that the trial court did not err in admitting them. State's Exhibit Nos. 3, 4 and 5 are photographs of Mr. Kirtley's body at the scene of the crime taken from different angles and rooms of Mr. Kirtley's house. These photographs show the condition of the body. They also assisted the jury in understanding the testimony of the witnesses who discovered Mr. Kirtley's body and the police when they described the crime scene.

State's Exhibit Nos. 36, 37, 38, 39, 41, 42 and 43 depict the different wounds that Mr. Kirtley sustained to his hands, the front and back of his head, and his neck and face. Each photograph provides a different view and/or a view of different wounds. These photographs assisted the jury in understanding the nature and condition of the wounds and the testimony of Dr. Dix, who performed the autopsy, as he described Mr. Kirtley's wounds and cause of death.

 Furthermore, these photographs were relevant to establish the elements of the crime. The jury was asked to decide whether defendant was guilty of murder in the first degree for aiding and abetting. To do so, the jury had to find that the defendant or Jason Minks caused the death of Mr. Kirtley by stabbing him, that they knew or were aware that their conduct would cause or was practically certain to cause the death of Mr. Kirtley, that they did so after deliberation, and that defendant acted together with, aided, or encouraged Jason Minks in committing the offense. The crime scene and autopsy photographs are relevant in establishing the cause of death, the intent of the defendant, and defendant's liability as an accomplice.

Defendant contends that his liability did not depend on establishing the cutting wounds as the cause of death and that the photographs were not relevant to whether defendant aided, abetted, or encouraged Jason in inflicting these wounds. Defendant oversimplifies the role of the jury and the state's burden of proof.

As the Missouri Supreme Court stated in *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995), there are three circumstances which permit an inference of accessory liability in first degree murder cases: (1) "a statement or conduct by the defendant or . . . a codefendant in the presence of the defendant prior to the murder indicating a purpose to kill a human"; (2) "evidence that the murder was committed by

means of a deadly weapon and the accomplice was aware that the deadly weapon was to be used in the commission of a crime"; and (3) "evidence that the accessory either participated in the homicide or continued in the criminal enterprise when it was apparent that a victim was to be killed." *Id.* at 376–77. Evidence of the cutting wounds helps demonstrate at least the latter two bases for liability, for it demonstrates use of a deadly weapon, and further demonstrates that defendant must have been aware that the victim was to be killed by the time he assisted by cutting the telephone line.

Defendant cites two other cases, *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), and *State v. Robinson*, 328 S.W.2d 667 (Mo.1959), in which the Missouri Supreme Court held that the trial court abused its discretion by admitting photographs of the victims. Both cases, to the extent they are still valid law, are distinguishable.

*State v. Floyd*, 360 S.W.2d 630 (Mo.1962), reversed a manslaughter conviction because of the admission of a photograph of the victim's decomposed body that was taken eleven days after her death. In that case, however, even the prosecution admitted that the body was in such a state of decomposition that it was not relevant to matters of identity, nature of injury, character of weapon, cause of death or degree of crime. *Id.* at 633. On the other hand, the photographs in the instant case depict the crime scene and clearly show the wounds suffered by Mr. Kirtley. Thus, they were relevant to show the nature of the wounds, the elements of the case, and clarify the testimony of witnesses.

Defendant also cites *State v. Robinson*, 328 S.W.2d 667 (Mo.1959), wherein the Missouri Supreme Court held that photographs which are obscene and offensive should not be admitted where the defendant stipulates to every fact which could be proven by the photographs. Defendant contends that, as in *Robinson*, the photographs in this case should not have been admitted because defendant stipulated to the fact that Mr. Kirtley was killed.

The Missouri Supreme Court brought the continued validly of *Robinson*—and of *Floyd*—into question in *State v. Newberry*, 605 S.W.2d 117 (Mo.1980), stating:

> In *Robinson*, after holding that other errors required reversal of the conviction, the court condemned photographic evidence introduced by the state as 'extremely obscene, offensive, vulgar, horrid, and repulsive.' Just what provoked the court's reaction cannot be gleaned from the opinion. *Floyd* involved photographs of a badly decomposed body which could have no probative value. *Robinson* and *Floyd* have been regularly distinguished in subsequent cases. No case has been found subsequent to *Floyd* in which admission of a photograph of the victim has been held error.

*Id.* at 122.

*State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988), casts further serious doubt on the rationale of *Robinson*. *Schneider* held that "a photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the State precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved." *Id.* at 403. While *Schneider* did not cite to or directly overrule *Robinson*, its rationale is in direct conflict with the rationale of *Robinson*.

The trial court actions in following the rule set by *Newberry*, *Schneider*, and similar cases decided over the past 30 years did not result in manifest injustice or a miscarriage of justice. Point I is denied.

## III. DEFENDANT'S CONSTITUTIONAL OBJECTIONS TO THE JURY SELECTION RULE SET OUT IN § 494.480.4 ARE WITHOUT MERIT

Under Point II defendant contends the trial court erred when it overruled his challenge for cause to strike venireperson Davis.[3]

---

3. Defendant contends that Mr. Davis should have been struck for cause because during voir dire Mr. Davis stated that he "would tend to go to-

ward the police officer, basically because usually they are more trained and their work experience—quite frequently, they're much better at

The state argues this assignment of error is precluded by section 494.480.4, RSMo 1994, because Mr. Davis was eventually stricken by defendant's use of a peremptory strike and did not sit on defendant's jury. Section 494.480.4 became effective on August 28, 1993, and governs peremptory challenges as follows:

> The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

§ 494.480.4, RSMo 1994.

Defendant's trial was held in October, 1992. Defendant concedes that the Missouri Supreme Court held in *State v. Gray*, 887 S.W.2d 369, 383 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995), that retroactive application of § 494.480.4 does not violate the prohibition against *ex post facto* application of the law. He argues, however, that *Gray* did not address whether section 494.480.4 is unconstitutional on the basis that in enacting it the legislature has usurped the powers of the judiciary in violation of the Missouri Constitution. As defendant notes, "Article V, Section 1, vests the judicial authority of this state in 'a Supreme Court, and Court of Appeals, ..., and circuit courts,'" and "Article II, Section 1 prohibits one branch of government (here, the legislature) from exercising power properly belonging to another branch of government (here, the judiciary)."

Before we reach the merits of this question, we must determine whether we have jurisdiction to address it, or whether the issue must be addressed by the Missouri Supreme Court in the first instance.

### A. *This Court Has Jurisdiction to Decide This Issue.*

■ Article V, § 3 of the Missouri Constitution provides that the Missouri Supreme Court has exclusive jurisdiction of all cases involving the validity of a statute. However, "[t]he mere assertion of a constitutional issue ... does not deprive the court of appeals of jurisdiction unless the constitutional issue is real and substantial and not merely colorable." *State v. Clark*, 756 S.W.2d 565, 569 (Mo.App.1988), *citing, State v. Charity*, 637 S.W.2d 319, 321 (Mo.App.1982). A claim is:

> substantial when, upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy; but, if such preliminary inquiry discloses that the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable.

*Kansas City Star Co. v. Shields*, 771 S.W.2d 101, 103 (Mo.App.1989) (citations omitted). We therefore have jurisdiction to examine the claim to see whether it is so unsubstantial and insufficient as to be merely colorable, and to reject it accordingly. Conversely, if a preliminary inquiry shows the claim to have some potential merit, we must allow the Missouri Supreme Court to address it.

As noted, defendant contends that section 494.480.4 is unconstitutional because in it the legislature has effectively exercised judicial power by its elimination of defendant's right to claim error based on the erroneous rejection of a challenge of a juror for cause if defendant exercises a peremptory challenge against that juror. Defendant cites no authority in support of his contentions other than the constitutional provisions precluding the legislature from exercising judicial power. These constitutional provisions do not address the issue whether the statute at issue does constitute an improper legislative

---

observing facts as they occur than say, I am or a layperson." The trial court overruled defendant's motion to strike Mr. Davis for cause even though it struck venireperson Quick who merely stated "Yes, sir" when asked if he would tend to give police officers more weight than a lay witness. However, as the state noted, additional

grounds existed for striking Quick such as the fact that his brother was an investigator for the sheriff in the county where the trial was being held, one of the prosecutors in the case represented Quick's company in civil litigation, and Quick served on a jury the week before defendant's trial.

exercise of judicial power. This failure alone provides a sufficient basis to deny this Point on appeal.[4]

We have nonetheless independently considered the constitutional issue raised, and find it to be insubstantial and, at best, merely colorable. We therefore have the authority to address the claim.

**B. *Section 494.480.4 Does Not Constitute a Legislative Usurpation of Judicial Power.***

■ The underlying premise of defendant's constitutional claim is that, by denying him the right to make his peremptory strikes from a list of qualified jurors, the legislature has usurped judicial power. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), however, the United States Supreme Court recognized that the right to a panel of qualified jurors from which to make peremptory challenges is not a judicially created right. It held that there is no constitutional right to a full panel of qualified jurors from which to exercise peremptory challenges because peremptory challenges are merely creates of statute. *Id.* at 88–89, 108 S.Ct. at 2278–79. It is not a usurpation of judicial power to change or revoke a right created by statute.

The Missouri Supreme Court affirmed that the basis for a right to a panel of qualified jurors in criminal cases is statutory, not constitutional, in *State v. Schnick*, 819 S.W.2d 330 (Mo. banc 1991). *Schnick* held that, under the statutes then in effect, the trial court erred in requiring defendant to use a peremptory challenge to strike a juror who should have been stricken for cause. In so holding the Court stated that "the right to have a list of qualified jurors from which to make peremptory strikes arises not from the Constitution" but from legislation. *Id.* at 334.

The Court in *Schnick* went on to invite the legislature to consider changing the relevant statutes so that error would not be found if the jurors who actually sit on a jury are qualified. *Id.* The legislature apparently

took heed of this comment; in any event, it did revise the statute in 1993 in the manner suggested in *Schnick*. It is the revised language which is now objected to by defendant.

Defendant nonetheless suggests that the Missouri Supreme Court has not had occasion to consider the constitutionality of the revision to the section 494.480.4, and that we should now hold the revised statute unconstitutional. We believe that the above discussion from *Schnick* adequately demonstrates the constitutionality of the revised statute. In any event, we disagree with defendant's contention that the Missouri Supreme Court has not addressed the constitutionality of the revision to the statute. In *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994), the Court specifically stated that:

> In *State v. Schnick*, 819 S.W.2d 330, 334 (Mo. banc 1991), this Court made clear that the right to a list of qualified jurors from which to make peremptory strikes is not constitutional, but statutory. The relevant statute was amended and now provides that a potential juror's qualifications do not constitute grounds for a new trial or reversal if the juror was removed by a peremptory strike and did not serve.

*Id.* at 383, *citing,* § 494.480.4. We believe this language implicitly approves of the amendment.

For all of the above reasons, we reject defendant's claim that the revision to section 494.480.4 improperly usurps the powers of the judiciary. Appellant admits that *State v. Gray*, 887 S.W.2d at 383, held that section 494.480.4 is procedural and can be applied to persons, such as defendant, who were tried prior to the statute's enactment. The statute clearly states that error may not be alleged based on the claim that the defendant was forced to utilize a peremptory strike to strike an unqualified juror. Point II is therefore denied.

**IV. *SEARCH AND SEIZURE OF THE UTILITY KNIFE***

■ Under Point III defendant contends the search of his car and subsequent seizure

---

4. *See State v. Boyce,* 887 S.W.2d 447 (Mo.App. 1994) (addressing the same issue raised by defendant in this case and holding the claim was merely colorable where defendant failed to cite any authority or to develop a rationale for his claim).

of a box-cutter/utility knife from his car violated his right to be free from unreasonable search and seizures.

It is well-established that a defendant must file a motion to suppress with the trial court in order to attack the validity of a search and admissibility of evidence obtained as a result of the search on appeal. *State v. Anderson*, 698 S.W.2d 849, 851 (Mo. banc 1985). The record on appeal in this case is devoid of any indication that defendant filed a motion to suppress the box-cutter/utility knife found in his car. Therefore, defendant has failed to preserve this point for appellate review.

The Court has reviewed the admission of the utility knife as plain error. Review under this standard justifies reversal only if the trial court's actions resulted in manifest injustice or a miscarriage of justice. Rule 30.20; *State v. Childers*, 801 S.W.2d 442, 444 (Mo.App.1990). We do not find that reversal is required here. Even were we to believe that the original search was improper, the utility knife was properly admissible under the inevitable discovery rule.

As the Missouri Supreme Court explained in *State v. Butler*, 676 S.W.2d 809, 813 (Mo. banc 1984), the inevitable discovery doctrine allows admission of evidence, even if the evidence was illegally obtained, if the evidence inevitably would have been discovered by lawful means. The Court explained that:

> Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial.... Suppression, in these circumstances, would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice.

*Butler*, 676 S.W.2d at 813 (citations omitted).

In this case, if the police officers had not searched defendant's car and found the utility knife at that time, they would have been able to obtain a search warrant based on the statements of Mr. Lingo. They would have discovered the utility knife when executing the warrant. Thus, the utility knife was admissible under the inevitable discovery rule and Point III is denied.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO OBJECT TO ADMISSION OF PHOTOGRAPHS DESCRIBED UNDER POINT I

Under Point IV defendant contends the motion court erred in denying his Rule 29.15 motion because defendant received ineffective assistance of counsel in that his counsel failed to object and preserve for appellate review the introduction of certain autopsy and crime scene photographs. Specifically, defendant asserts his trial counsel should have lodged objections against the admission of State's Exhibit Nos. 3, 4, 5, 36, 37, 38, 39, 41, 42 and 43, the same exhibits that defendant argues are not properly admissible under Point I. The motion court denied defendant's Rule 29.15 motion concluding that any objections to the photographs would have been without merit because the photographs were relevant and admissible to show the nature and extent of the victim's wounds and the circumstances surrounding the murder.

### A. Standard of Review.

Appellate review of the motion court's decision on a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(j). Such findings and conclusions are deemed clearly erroneous "only if, after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987), *cert. denied*, 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989).

### B. Failure to Object to Admission of Photographs Does Not Amount to Ineffective Assistance of Counsel.

To prevail on a claim of ineffective assistance of counsel a movant must prove that (1) counsel's performance was deficient, and (2) movant was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The first prong of this test requires

movant to show that counsel did not exercise the customary skill and diligence that a reasonably competent attorney would have exercised in similar circumstances. *Sanders*, 738 S.W.2d at 857. There is a strong presumption that counsel's conduct falls within "the wide range of reasonable professional assistance and a movant must overcome the presumption that certain actions of counsel might be regarded as sound trial strategy." *Bevly v. State*, 778 S.W.2d 297, 298 (Mo.App. 1989) (citations omitted).

If counsel's conduct is found to be deficient, then the movant must meet the second prong of the test by affirmatively proving that he was prejudiced as a result of counsel's actions. *Strickland*, 466 U.S. at 693–94, 104 S.Ct. at 2067–68. As the Court of Appeals explained in *Bevly*:

> The fact that an error by counsel might have had some conceivable effect on the outcome is not sufficient. Rather, movant, when challenging a conviction, must show there is a reasonable probability that, absent the alleged error, the fact finder would have had a reasonable doubt respecting guilt.

*Bevly*, 778 S.W.2d at 298–99. The court must consider the totality of the evidence in determining whether a reasonable probability exists. *Id.* at 299.

It is well-established in Missouri that counsel cannot be found ineffective for failing to make nonmeritorious objections, *Sidebottom v. State*, 781 S.W.2d 791, 798–99 (Mo. banc 1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990); *State v. Six*, 805 S.W.2d 159, 171 (Mo. banc 1991), *cert. denied*, 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991), or for failing to object to admissible evidence. *State v. Wishom*, 824 S.W.2d 101, 103 (Mo.App.1992). As noted above, the photographs at issue in this matter were admissible. Trial counsel therefore cannot be deemed ineffective for failing to object to admissible evidence.

Moreover, trial counsel may legitimately decide not to object to evidence as a matter of trial strategy and allegations of ineffective assistance of counsel relating to matters of trial strategy do not provide a basis for post-conviction relief. *Rainwater v. State*, 770 S.W.2d 368, 370 (Mo.App.1989). At the evidentiary hearing in the instant case, defendant's trial counsel testified that he did not object to the photographs as a matter of trial strategy, explaining that in his experience "objections to unduly gruesome photographs are rarely sustained." Therefore, "rather than object to them and lose, [trial counsel] chose to sit silent as a matter of strategy."

As noted earlier, in *State v. Newberry*, 605 S.W.2d at 122, the Missouri Supreme Court itself reached the conclusion that no case in the last 20 years had found reversible error based on the admission of gruesome photographs. It certainly did not constitute ineffective assistance for trial counsel to review the cases, reach the same conclusion, and decide it would not be worthwhile to object to admission of the photographs.

Finally, even if counsel's performance had been deficient, his failure to object "does not rise to the level of ineffective assistance of counsel unless movant has suffered a substantial deprivation of the right to a fair trial." *Bevly*, 778 S.W.2d at 299. As explained in *Smith v. State*, 714 S.W.2d 778 (Mo.App.1986), the "matter of ineffective assistance of counsel must go beyond a mere error in judgment. The ultimate test is whether the efforts and representation of the attorney have reached a level of adequacy so that the defendant has had a fair trial." *Id.* at 780–81 (citations omitted).

Defendant contends he was "prejudiced by [trial counsel's] ineffectiveness as it has forced him to rely on the plain error rule for relief from the egregious display of these horrid and vulgar photographs." However, claims for post-conviction relief based on trial counsel's failure to adequately preserve issues for appeal are not cognizable under Rule 29.15. Rather, "[p]ost-conviction relief for ineffective assistance of counsel is limited to errors which prejudiced the movant by denying him the right to a fair trial." *State v. Loazia*, 829 S.W.2d 558, 569 (Mo.App. 1992). *See also Kirk v. State*, 778 S.W.2d 661, 662 (Mo.App.1989) (defendant's claim that counsel's inaction affected his ability to

appeal the conviction "does not state a claim cognizable under Rule 29.15.").[5]

■ Finally, we note that there was ample additional evidence in the record to support defendant's conviction. Mr. Lingo testified regarding the events surrounding the murder; Mr. Lingo was at the Minks' residence on the night of the murders and participated in the events and conversations leading up to and following the murders. In addition, a sworn statement of defendant describing the events on the evening of the murder was entered into evidence, as was police testimony regarding defendant's statement. In these circumstances, we could not say that admission of the photographs was so prejudicial as to deprive defendant of a fair trial. We therefore find the motion court was not clearly erroneous in denying defendant's post-trial motion. Point IV is denied.

For the reasons stated above, we affirm the conviction and affirm denial of post-conviction relief.

All concur.

---

**5.** Defendant cites to *Starr v. State*, 735 S.W.2d 134 (Mo.App.1987), in support of his contention that "since the attorney had failed to object at trial and properly preserve the error in a motion for new trial, the Court of Appeals concluded that the issue was not one for direct review, but rather one for postconviction review." If defendant is contending that court in *Starr* held that failure to preserve an issue for direct appeal is a claim cognizable in post-conviction relief, he is erroneous. Rather, the court in *Starr* merely clarified that "[a] claim of ineffective assistance of counsel grounded in the attorney's failure to object to crucial evidence is a claim separate and distinct from the issue of whether the trial court erred in admitting the proof" and that a claim that counsel is ineffective is appropriately addressed in post-conviction relief. *Id.* at 136.